# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-KA-00294-SCT

*DEXTER POWELL*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/22/2017 |
| TRIAL JUDGE: | HON. MARGARET CAREY-McCRAY |
| TRIAL COURT ATTORNEYS: | TAKIYAH HERMIONE PERKINS |
| | KAYLON ALEXANDER McCOU |
| | MICHAEL ANTHONY WILLIAMS |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: HUNTER NOLAN AIKENS |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOSEPH SCOTT HEMLEBEN |
| DISTRICT ATTORNEY: | WILLIE DEWAYNE RICHARDSON |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/26/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE KITCHENS, P.J., KING AND BEAM, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     Dexter Powell was convicted of aggravated assault and felon in possession of a firearm following a jury trial in the Washington County Circuit Court. He appeals from those convictions, claiming: (1) ineffective assistance of counsel, and (2) insufficient evidence in

support of the verdicts, both of which also were against the overwhelming weight of the evidence. Finding no reversible error, we affirm the trial court's judgment of convictions.

**FACTS**

¶2. On May 3, 2015, Jamarcus Barton, Darry Buck, Marcus Jones, Larry Ross, Adrian Pam, and Eddie Brisco went to Club Fountain after a day of drinking and playing dominos at Barton's house. Buck drove the group to the club in a Chevrolet Tahoe.

¶3. At the club, the group encountered Powell. At some point, a dispute broke out between Barton and Powell about an incident that had happened in the past. The two went outside the club, where the argument turned physical after Powell poked Barton in the eye. At that point, Barton struck Powell and Powell fell to the ground and urinated on himself. According to Barton, he then helped Powell up because "[w]e're homeboys. I mean, homeboys fight. It was over with."

¶4. Afterward, others from the group came outside to see what was happening. When Pam saw Powell, he said, "Man, you peed on yourself." Pam, Buck, and Barton then walked to the corner of the street.

¶5. According to Pam, he was unaware that a physical altercation had occurred. Pam said that while he was standing with Powell, he heard Powell on his cellular telephone asking someone named "D" to bring Powell a "strap."

¶6. According to Buck, Powell's childhood friend, when he saw that Powell had urinated on himself, he insisted that he take Powell home. Buck pulled the Tahoe around and the group got into the truck. Buck was driving; Jones sat in the in the front passenger seat;

2

Barton sat behind Buck; Powell sat behind Jones, and Pam sat in the middle seat between Barton and Powell. Brisco sat in the third row behind Barton, Pam, and Powell. Ross was left behind at the club.

¶7. Buck drove to Powell's house. According to Pam, when Powell opened the door to get out, the vehicle's interior light came on, revealing that Powell was holding a gun. Pam grabbed the barrel of the gun and the two men struggled over the gun, then Powell fell out of the vehicle with the gun.

¶8. When Powell stood up, he pointed the gun and fired, striking Barton in the upper-right side of his back. Barton got out of the vehicle on the other side and ran to the front of vehicle, where he collapsed. Pam got out of the vehicle and helped Barton to his feet.

¶9. According to Barton, Powell came around the back of the vehicle still holding the gun, and "another shot went off." Barton then took off running. Powell ran off in another direction.

¶10. The group got back into the vehicle and drove down the street looking for Barton. Barton flagged them down. They realized that Barton had been shot and drove him to the Delta Regional Medical Center. Barton was then airlifted to the University of Mississippi Medical Center in Jackson.

¶11. In February 2016, Powell was indicted for aggravated assault and felon in possession of a firearm. According to Barton, at some point prior to trial, Powell contacted him and offered Barton $2,500 to drop the charges.

¶12. At trial, Barton, Pam, Brisco, Buck, and Jones testified to the events that had occurred on May 3, including witnessing the shooting. Each testified that Powell had gotten into Buck's vehicle voluntarily, and each testified that no one had attempted to rob Powell, as Powell would claim. Each identified Powell as the person who shot Barton.

¶13. Officer Angie Rushing and Investigator Dennis Buckner of the Greenville Police Department testified as to their investigation in the matter. Officer Rushing interviewed Barton at the hospital and passed her information to Investigator Buckner.

¶14. According to Buckner, Powell developed as a suspect in the shooting based on information he had received from Barton and Pam. Investigator Buckner performed a gunshot residue (GSR) kit on Powell and submitted the kit to the Mississippi Crime Laboratory for testing. Jacob Burchfield, a forensic scientist with that crime laboratory, testified as an expert in GSR analysis. According to Burchfield, a single particle indicative of GSR was present on Powell's right palm.

¶15. At the conclusion of the State's case-in-chief, Powell moved for a directed verdict, which the trial court denied. Powell then proceeded with his case-in-chief.

¶16. Powell's sister, Allison Gilmore, testified that on the night in question, Powell had showed up at her house between 2:00 and 4:00 a.m. She said Powell was drunk and had been beaten up, and he told her "they tried to kill me." She said she called the police to report the incident, and when the police responded to her house, they searched the house, impounded Powell's girlfriend's car, and left. On cross-examination, Gilmore could not remember whose telephone she used to call the police. There was no record of a call made to the police

4

on her phone. Gilmore further testified that she did not file a police report or give any statement regarding her claim that Powell was the victim of an attempted robbery.

¶17. Tavarus Walker testified that he was outside Club Fountain on the night in question and saw a group of men forcing Powell into a truck. Walker said he did not call the police or report the incident to anyone.

¶18. Christopher O'Neal, Powell's brother, testified that he had a conversation with Buck on April 5, 2015, and Buck stated that "it wasn't supposed to go down like that. They got to fighting about some money . . . and [Powell] had [taken] the gun from Jig. Because first they thought Jig had [given] the gun to [Powell] but [Powell] had [taken] the gun from Jig." O'Neal testified he did not know Jig's real name.

¶19. Powell testified in his own defense. According to Powell, on May 1, 2015, he had between $2,000 and $2,500 in cash, and he had posted a picture on Facebook showing the money in his lap. On the night of May 3, Powell was at the club, and he had about $600 on him, which he pulled out when he went to the bar to buy drinks. Powell said Barton approached him and asked him to come outside. Once outside, they saw Pam and began walking toward him. As they walked toward Pam, Barton punched Powell, knocking him to the ground. While he was on the ground, Powell felt Barton reaching inside Powell's pockets. When Powell tried to get up, Barton hit him again, knocking Powell back to the ground. Powell said they then forced him into Buck's vehicle. Inside the vehicle, Pam pulled a gun on Powell and asked him where the rest of Powell's money was. Powell said the group knew about Powell's money from Powell's Facebook posting.

5

¶20. According to Powell, when the Tahoe stopped on Moore Street, Pam told Powell to get out, and Pam got out behind Powell, holding a gun on him. Powell grabbed the gun from Pam, and as they wrestled for control of the gun, the gun discharged. Powell said: "When I grabbed it, I pointed it towards him where if he shot, he wouldn't sho[o]t me. And I kept it like that til we got it around. And so I twist it, and as I'm wrestling with him, I can see the other guy trying to hop out of the car, and the gun went off." Powell said he never gained possession of the gun. "I didn't take the gun. It was a struggle. The gun went off. I never did possess the gun, period. When [the] gun went off, I ran."

¶21. Powell said he hid under a nearby house until he felt it was safe to come out. Then he walked to his house nearby. Because he feared Barton and Pam might come back, Powell and his girlfriend went to Powell's sister's house. Powell said he had "a couple of lumps or something" on his head, and his eye was a little swollen, but he wasn't hurt that badly. Powell told his sister he had been robbed and asked her to call the police. Powell said he never filed a police report because when the police arrived at his sister's house, they immediately arrested him. Powell denied ever offering Barton money to drop the charges.

¶22. After the defense rested, the State called Officer Malcolm Davis of the Greenville Police Department. Davis testified that on May 3, 2015, he was dispatched to a house located on Belfast Street about an individual involved in a shooting. When he arrived, he apprehended Powell. He said Powell did not show any physical signs that he had been beaten up or otherwise involved in a physical altercation. Davis said he was not informed by anyone there that a robbery had taken place.

6

¶23.    The jury was instructed on the law of aggravated assault and felon in possession of a firearm.  The defense requested and was granted a jury instruction on the defense of necessity.

¶24.    The jury found Powell guilty of aggravated assault and felon in possession of a firearm.  Powell was sentenced to ten years in the custody of the Mississippi Department of Corrections (MDOC) for aggravated assault, and ten years for felon in possession of a firearm, the sentences to run concurrently.  Powell was sentenced to ten years in the custody of the MDOC for firearm enhancement, said sentence to be served consecutively to the sentences imposed for Counts I and II.

¶25.    Powell thereafter filed a motion for judgment notwithstanding the verdict (JNOV), or, in the alternative, for a new trial.  The trial court denied the motion, and this timely appeal followed.

## DISCUSSION

### I.    Ineffective Assistance of Counsel

¶26.    Powell claims his trial counsel was constitutionally ineffective for (1) failing to request a jury instruction on the law of accident, and (2) failing to object to the prosecutor's *Doyle*[1] violation when cross-examining Powell.

¶27.    We decline to address Powell's ineffective-assistance-of-counsel claim(s) on direct appeal. "Ordinarily, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." *Archer v. State*, 986 So. 2d 951, 955 (Miss. 2008).

---

[1] *Doyle v. Ohio*, 426 U.S. 610, 618, 96 S. Ct. 2240, 2245, 49 L. Ed. 2d 91 (1976).

On direct appeal, this Court "is limited to the trial court record in its review of the claim, and there may be instances in which insufficient evidence exists within the record to address the claim adequately." *Id*. "In such a case, the appropriate procedure is to deny relief, preserving the defendant's right to argue the issue through a petition for post-conviction relief." *Id*. This Court may, however, address the merits of an ineffective-assistance-of-counsel claim on direct appeal "if the record affirmatively shows ineffectiveness of constitutional dimensions." *Quinn v. State*, 191 So. 3d 1227, 1234 (Miss. 2016).

¶28. Here, Powell's claim that a *Doyle* violation occurred at trial concerns matters outside the record now before the Court. *Doyle* holds that use of a criminal defendant's silence to impeach the defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his or her failure to have told the story after receiving *Miranda*[2] warnings at the time of the defendant's arrest, violates the defendant's right to due process. *Doyle*, 426 U.S. at 619.

¶29. But, as Powell acknowledges on appeal, the record does not show when Powell was read (or invoked) his *Miranda* rights. This would have to be established for this Court to consider whether a *Doyle* violation occurred. *See McGrone v. State*, 807 So. 2d 1232, 1235 (Miss. 2002) (holding that, in the absence of evidence that *Miranda* warnings were given, it does not violate due process of law to permit cross-examination as to post-arrest silence

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

when a criminal defendant chooses to testify at trial); *see also* **Fletcher v. Weir**, 455 U.S. 603, 607, 102 S. Ct. 1309, 1312, 71 L. Ed. 2d 490 (1982) (same).

¶30. Accordingly, we dismiss Powell's ineffective-assistance-of-counsel claim(s) without prejudice to allow Powell to raise the claim(s) in a post-conviction relief (PCR) proceeding, if Powell so chooses.

> **II. Whether Powell's convictions are supported by sufficient evidence, or whether the jury's verdicts are against the weight of the evidence.**

¶31. Powell contends the State failed to prove beyond a reasonable doubt that Powell was not acting in self-defense when the gun discharged and injured Barton. Powell submits it was undisputed that Powell and Pam fought over the gun when the Tahoe stopped and Barton was shot. Powell maintains that he had $600 on him at the club and had pulled the money out to buy drinks. And the day before the shooting incident, Powell had posted a picture on Facebook showing more than one thousand dollars sitting in his lap.

¶32. Powell also points to Buck's trial testimony in which Buck was asked on cross-examination by the defense about Buck accusing Pam of having given the gun to Powell, and Pam responding to Buck saying, "I didn't give him the gun. He took the gun from me." Powell submits this further undermines the State's attempt to show that Powell had called a friend and later received the gun from him.

¶33. Powell further contends the evidence was insufficient to prove beyond a reasonable doubt that Powell possessed a firearm, or if he did, that he did not do so out of necessity.

9

¶34.	Alternatively, Powell submits the jury's verdict as to both charges was against the overwhelming weight of the evidence.

¶35.	When assessing the legal sufficiency of a conviction, a reviewing court determines "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Cotton v. State*, 144 So. 3d 137, 142 (Miss. 2014). This Court will reverse and render a conviction "[i]f facts and inferences considered by the Court point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty." *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985).

¶36.	When reviewing a trial court's denial of a defendant's motion for a new trial challenging the weight of the evidence, we will not disturb the jury's guilty verdict unless the record demonstrates that the verdict is "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Miller v. State*, 980 So. 2d 927, 929 (Miss. 2008). "In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only when convinced that the circuit court has abused its discretion in failing to grant a new trial." *Id*. (quoting *Boone v. State*, 973 So. 2d 237, 243 (Miss. 2008)).

¶37.    Here, the evidence shows that Buck, Pam, Brisco, Jones, and Barton each testified that Powell got into Buck's vehicle voluntarily. And each testified that no one attempted to rob Powell.

¶38.    While Powell did testify that the gun went off while he and Pam were tussling for the gun, that testimony was contradicted by Pam's testimony. Pam testified that when the vehicle's interior light came on, he saw Powell holding a gun. Pam grabbed the gun, and the two men struggled over it. According to Pam, Powell "yanked down" and "fell out of the truck" with the gun. Powell then stood up and pointed the gun into the vehicle and said, "I don't know what y'all [expletive] putting down." Barton then pounded the seat and said, "Man, put the gun down," at which point Powell fired the gun, striking Barton.

¶39.    As the State points out, this was consistent with Barton's testimony. Barton testified that at the time of the shooting, he was "leaning up on the seat." Barton told the jury that when he saw the gun, "I was like, 'get the gun from that man.' And by the time I hit the back of the seat, that's when he shot."

¶40.    If believed by the jury, this is more than sufficient evidence to prove the charges of aggravated assault and felon in possession of a firearm, as charged in Powell's indictment, to wit: that Powell did "unlawfully, willfully and feloniously, purposely, or knowingly cause or attempt to cause serious bodily injury to Jamarcus Barton, by shooting him, thereby manifesting extreme indifference to the value of human life[,]" and that Powell "did willfully, unlawfully and feloniously use or display a firearm, while being a convicted felon, at the time of the commission of the offense of [a]ggravated [a]ssault . . . ."

¶41. Nor do we find that the evidence preponderates against the verdicts so heavily as to sanction an unconscionable injustice. "The jury is the judge of the weight and credibility of the witnesses' testimony, and it is free to reject all or some of each witness's testimony." *Ragland v. State*, 235 So. 3d 1387, 1394 (Miss. 2017).

¶42. On this record, we can say only that the jury rejected Powell's version of events and accepted all, or at least part, of the State's version. Accordingly, this issue is without merit.

## CONCLUSION

¶43. The Washington County Circuit Court's judgment of convictions for aggravated assault and felon in possession of a firearm is affirmed.

¶44. **AFFIRMED**.

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, MAXWELL, CHAMBERLIN AND ISHEE, JJ., CONCUR.**